**ARMINGTON v. GILCREASE OIL CO.**
**et al.**

No. 11524.

Court of Civil Appeals of Texas.
San Antonio.

July 5, 1945.

Rehearing Denied Sept. 19, 1945.

588

Andrews, Kelly, Kurth & Campbell and T. A. Slack, all of Houston, and Frank C. Davis, of San Antonio, for appellant.

Brewer, Matthews, Nowlin & Macfarlane, Grady Barrett, Lester Whipple, and Arnold & Cozby, all of San Antonio, for appellee.

MURRAY, Justice.

We take the statement of the nature and result of the case from appellant's brief, which reads as follows:

"Gilcrease Oil Company filed its bill of interpleader in the district court, alleging that prior to their deaths Frank and Caroline Armington, husband and wife (herein referred to as 'the Armingtons'), had purchased from the company undivided interests in certain producing oil, gas and mineral leases in Texas, which had been paid for in full, but for which no deeds or assignments had ever been executed by the company; that at the time of such purchases it was agreed between the company and the Armingtons that assignments would be issued in accordance with the Armingtons' later instructions; that thereafter on July 19, 1939, the Armingtons, by written instruments and by word of mouth, 'instructed' the company to make the assignments to certain persons (herein called 'the Wilkinsons') and the American Church in Paris (herein called 'the Paris Church') appellees herein. The Wilkinsons and the Paris Church were named defendants in the bill of interpleader, as was also appellant, Jessie Fisher Armington, who claims as heir and sole devisee of Caroline and Frank Armington. The company tendered into Court some $3000.00, being income from the leases since 1941, and offered to execute assignments of the interests in the leases in accordance with the judgment of the Court. Jessie Fisher Armington pleaded the statute of frauds and contended that the written 'instructions' relied upon by the Wilkinsons and the Paris Church were not sufficient to pass the previously acquired title of the Armingtons to any of the property and that the evidence did not show a completed gift or assignment of any property to any of appellees.

"The Wilkinsons and the Paris Church contended that the purchases by the Armingtons were a contract for their benefit and that the statute of frauds and the law pertaining to gifts were not applicable.

"It was stipulated by all parties that Caroline Armington died intestate before Frank Armington's death and had no child or children born to her and that thereafter Frank Armington married Jessie Fisher Armington. The trial court found Jessie Fisher Armington to be the sole devisee of Frank Armington. Thus, it is apparent that all property here involved belongs either to appellant, Jessie Fisher Armington, or to the other defendants named in the bill of interpleader; namely, the Wilkinsons and the Paris Church.

"The case was tried before the judge without a jury; and from a judgment in favor of the Wilkinsons and the Paris Church for the money and the leases, Jessie Fisher Armington has perfected this appeal."

The all-important question in this case is: Did the equitable title to the properties involved in this litigation pass out of the Gilcrease Oil Company into Frank and Caroline Armington prior to July 19, 1939, the date on which they gave the names of the persons to whom they desired the assignment executed?

The trial judge made the following findings of facts, to-wit:

"Findings of Fact.

"1. The Gilcrease Oil Company, plaintiff, is an Oklahoma corporation with a permit to transact business in Texas and has an office in San Antonio, Bexar County, Texas. The defendant William Clark Wilkinson lives in Florida, the defendant John Stevens Wilkinson, in Ontario, Canada, the defendants William Wilkin-

son, Russell Wilkinson and Alberta Vivian Young (formerly Alberta Vivian Wilkinson) and her husband, John Kerr Young, live in Saskatchewan, Canada, and the defendants E. L. Vivian Wilkinson, a feme sole, William Henry Wilkinson and Adelaide Wilkinson likewise live in Canada; the defendants mentioned in this sentence are hereinafter referred to collectively as 'the Wilkinsons.' The defendant Jessie Fisher Armington, a feme sole, resides in the State of New York and is the sole devisee of Frank M. Armington, deceased, and the defendant American Church in Paris is an unincorporated religious society having as its Trustee with authority to hold all property for said religious society, the American and Foreign Christian Union, a New York corporation; Robert Lee Humber is a member of the Board of Trustees of said Church and President thereof. The Wilkinson defendants above named are all nieces and nephews of Frank M. Armington and wife, Caroline Armington, deceased, with the exception of E. L. Vivian Wilkinson, who is a sister of Frank M. Armington, deceased, and William Henry Wilkinson, who is a brother of Caroline Armington, deceased.

"2. This suit involves a series of transactions and a contract between one Frank M. Armington and wife, Caroline Armington, and the Gilcrease Oil Company. Frank M. Armington and his wife, Caroline Armington, were artists, born in Canada, who for more than thirty years prior to the month of October, 1939, had resided in Paris, France. In October, 1939, shortly after the outbreak of the current World War, the Armingtons left Paris and went to New York City where they both remained until they died.

"3. Beginning in the year 1933, Gilcrease Oil Company, as the owner of undivided working interests under producing oil, gas and mineral leases covering lands situated in the State of Texas, offered certain participating interests therein for sale to various persons in France, through its Paris office and its Paris agent, Robert Lee Humber. Frank M. Armington and his wife, Caroline Armington, were personal friends of Robert Lee Humber and through him became interested in said participating interests and a plan was worked out between Humber and the Armingtons whereby the Armingtons could be credited with commissions in connection with the sales of such participating interests which might be made to their friends and acquaintances who were introduced to Humber by them and under which plan the Armingtons might make payments from time to time upon such participating interests out of funds derived from other sources. Accordingly, a definite arrangement was made between the Gilcrease Oil Company, acting through Humber, and Frank M. Armington and Caroline Armington that they would be credited on the books of Gilcrease Oil Company with amounts earned as commissions and amounts which they might pay in, such credits to go toward the purchase of the participating interests and that upon the completion of payments for such interests from time to time that the income from the oil production covered by such interests would be paid over to the said Frank M. and Caroline Armington during their lives or the life of the survivor of them, but in order to meet the express desires of the Armingtons, it was specifically understood that no assignments of such participating interests were to be made to them and that the title to said interests would be held and retained by the Gilcrease Oil Company to be conveyed (subject to a reservation of income) to persons whose names would be furnished at a later date after all of the interest had been fully paid for and that thereupon the transaction would be closed by the Gilcrease Oil Company making assignments of the participating interests to the persons to be so named by the Armingtons. Under this arrangement, commissions were credited and payments made to the account of the Armingtons during the period of approximately five years until finally, on July 19, 1939, the Armingtons came to the Paris office of the Gilcrease Oil Company and delivered to Humber the writings introduced in evidence and referred to as final 'instruction,' stating that the same constituted their final designations of the persons to receive assignments or conveyances of the interests upon which payments had been made in accordance with the above mentioned arrangement. These designations were received by Humber as the agent of Gilcrease Oil Company and he thereupon acting for said Company, and at the instance and request of the Armingtons agreed, in

consideration of the payments made and credited to the said Armingtons, that written assignments would be made by Gilcrease Oil Company to the persons mentioned in said written designations and the transactions with reference to said participating interests were thereupon finally closed. All of the transactions with regard to the matter were carried on with Humber and after July 19, 1939, no further transactions relating to such participating interests occurred between Humber and the Armingtons.

"4. I find from the evidence that the transactions with reference to the participating interests involved herein resulted in a contract between the Armingtons and the Gilcrease Oil Company whereby the Gilcrease Oil Company, in consideration of the payments made and credited to the account of the Armingtons, agreed and bound itself to transfer and convey the several participating interests to the American Church in Paris and the members of the Wilkinson family as provided in the judgment herein, subject to a reservation to the Armingtons of the income therefrom for life, and that said contract on July 19, 1939, was complete in all of its terms and that the verbal parts of said contract are now acknowledged and confessed in writing by the said Gilcrease Oil Company.

"5. I find from the evidence that it was definitely understood, in connection with all transactions between Frank M. Armington and his wife, Caroline Armington, and Robert Lee Humber, acting for the Gilcrease Oil Company, that the chain of continuing transactions with reference to said interests would be finally consummated by formal written assignments and that no title of any kind would pass out of Gilcrease Oil Company until said formal written assignments were executed and delivered and then only to the persons named as grantees or transferees in said assignments. I further find from the evidence that the agreement of July 19, 1939, with reference to the execution and delivery of said assignments was understood by all parties thereto to be a final agreement and that there was no agreement or understanding that either Frank M. Armington or his wife, Caroline Armington, would have any right whatsoever to change or alter said agreement or to require that conveyances be made to others than the persons so named and agreed upon to receive such assignments.

"6. I find that the execution and delivery of the assignments in accordance with the agreement mentioned above was delayed because of the war. Robert Lee Humber, in accordance with the expressed wish of the Armingtons, delayed the execution and delivery of the instruments until he could come to the United States which he expected to do shortly after July 19, 1939. He was delayed for a time due to war conditions in Europe and finally left Paris a short time before its invasion in June, 1940. Humber, on leaving Paris, carried a number of documents with him, but inadvertently left the so-called 'instructions' delivered in connection with the agreement reached on July 19, 1939, and the same were not received by the Gilcrease Oil Company in the United States until the summer of 1941. In the meantime, Caroline Armington had died in New York on October 25, 1939, and Frank M. Armington shortly thereafter, on September 21, 1941, died in New York, after having been married for about three months to the defendant Jessie Fisher Armington.

"7. I find from the evidence that the participating interests in the oil, gas and mineral leases covered by the contract between the parties mentioned above are those set out and described in the judgment entered herein.

"8. I find from the evidence that, in pursuance of the arrangement mentioned above, Frank M. Armington and Caroline Armington were credited with commissions and made payments to Gilcrease Oil Company in the total sum of Thirty-four Thousand, Five Hundred Dollars ($34,-500.00) and that in the writings naming the persons agreed upon to receive the assignments to said participating interests, the interest of each was designated by stating the amount of money paid therefor and thereby fixed the amount of interest of each as the relationship between said amount of money and the total sales price of the participating interest offered by the Gilcrease Oil Company in the various oil and gas leases through its Paris office.

"9. I find that the Gilcrease Oil Company has tendered into the registry of this court the sum of $3,180.90, representing credits on income earned from the mineral

interests in the leases above described, as follows, to-wit:

| | |
|---|---|
| J. M. Christian Lease | $1,149.66 |
| J. W. Free Lease | 643.61 |
| Texas No. 2 Group of leases | 1,387.63 |
| Total | $3,180.90 |

I further find that the Texas No. 1 Group of leases is debited on the books of the Gilcrease Oil Company in the sum of $115.33.

"10. I find that on July 12, 1941, Frank M. Armington wrote a letter to the Gilcrease Oil Company at San Antonio, Texas, stating that he had nothing in his possession to show for the investments in the Gilcrease Oil Company and asking if he could trouble said company to please have the assignments made out and sent to him in his name; and on July 28, 1941, he wrote another letter to the Gilcrease Oil Company at San Antonio, Texas, stating that he was anxious to have the physical certificates for his portfolio showing that he is the sole owner of the shares so that upon his death they would become the undisputed property of his widow, Jessie Fisher Armington. But I find that at about the time of the writing of these letters, the said Frank M. Armington advised the attorney for Gilcrease Oil Company that the same had been written at the insistence of Jessie Fisher Armington whom he had recently married and in order to keep peace with her and that it was his instructions to the Gilcrease Oil Company that it should not pay any attention to said letters or any letters that he might write with reference to said oil interests. I further find that in response to said letters a certified public accountant who does work for Gilcrease Oil Company and other clients, Mr. E. E. Parsons, wrote a letter to Mr. Frank M. Armington that the assignments were being made out, and assignments covering interests adjudged herein to the American Church in Paris were actually made out, but I find that neither such assignments or any others covering the various interests in leases above referred to were ever delivered to Frank M. Armington or anyone else by the Gilcrease Oil Company, and that Frank M. Armington wrote the letters above described to the Gilcrease Oil Company without any intention that the requests therein should be carried out by said Company.

"11. I find from the evidence that immediately upon learning of said contract and long prior to the death of either the said Frank M. Armington or Caroline Armington, that each of the beneficiaries of said contract learned of the same and that each of them accepted the provisions of the same as the third party beneficiaries under said contract and that none of them has ever consented to any change being made therein and that said third party beneficiaries of said contract have done or stand ready to do all things necessary to vest the rights and interests covered by said contract in them.

"12. I find from the evidence that the interpleader, Gilcrease Oil Company, plaintiff herein, filed its Bill in good faith for its own protection and adjudication of conflicting claims and that it is an impartial stakeholder in this controversy as between the respective claimants and that it is entitled to recover its reasonable attorney's fees owed to its attorney, Lester Whipple, in the amount of Fifteen Hundred Dollars ($1500.00), which the court finds is a reasonable fee and to its expenses in the sum of Two Hundred Twenty-three Dollars, Ninety-one Cents ($223.91) which the court finds were reasonable and necessary expenses incurred in the handling and presentation of the Bill of Interpleader, and that such fees and expenses should be equitably prorated and charged against the funds to the credit of the various leases in accordance with Paragraph 4 of the Judgment herein rendered to which reference is made and made a part hereof as if fully set out herein."

■ We are of the opinion that neither the pleadings nor the evidence supports the trial court's finding that the purchases by the Armingtons were one continuous transaction with an agreement that no title would be issued to the Armingtons, but would be conveyed to persons to be named at a later date, after all interests had been fully paid for. This is fully shown by the statement of the evidence in appellant's brief, which is as follows:

"The mineral leases involved in this suit are fully described in plaintiff's petition, but it was agreed that for convenience they would be referred to as they were by the oil company which sold them. The 'Free' lease is one lease; the 'Christian' lease is one lease; 'Texas No. 1,' or

'Texas Deal No. 1,' refers to a group, or block, of leases; and 'Texas No. 2,' or 'Texas Deal No. 2,' also refers to a group or block of leases. We believe it to be unnecessary to refer to these four properties or groups of properties herein except by their convenient, short names.

"Appellees, to sustain their claim to the properties involved, rely entirely upon transactions which occurred in the Paris office of Robert Lee Humber, agent for Gilcrease Oil Company, on July 19, 1939. At that time Frank and Caroline Armington handed to Mr. Humber the so-called 'instructions' or written documents, and, according to his testimony, stated orally that such were their final 'instructions' as to whom they wanted the assignments made. Since appellant contends that prior to this date the Armingtons already owned and held such title to the properties as could not be divested from them except in compliance with the statute of frauds and in accordance with the laws governing conveyances and gifts inter vivos, it becomes important to review all the pleadings and evidence which shed light on the nature of the Armingtons' property rights.

"The allegations of the bill of interpleader were that 'on or about the 19th day of July, 1939, and prior thereto * * * there was purchased from plaintiff by Frank M. Armington and Caroline Armington * * * certain interests in oil and gas mineral leases * * *,' and further that 'at the time of said purchases * * * and as a part of the purchase agreement * * * plaintiff would deliver assignments and make contracts in connection therewith to the Armingtons or to such person, firm, or corporation as the Armingtons might name, it being agreed that the Armingtons would later inform plaintiff how they desired the assignments and contracts * * * delivered * * *'.

"There is no other pleading and no evidence that the purchases made by the Armingtons were any different or made under any different terms than as set forth in the bill of interpleader just quoted. There is no pleading or evidence that the facts were, as found by the trial court, a continuing transaction and a definite understanding that the title would not be issued to the Armingtons, but would be issued to some other person to be named by them. The fact is the Wilkinsons adopted

the allegations of the bill of interpleader quoted above that the Armingtons purchased the several interests and that the assignments were to be made to them or to such other persons as they might name.

"All of the Armingtons' purchases were made through Robert Lee Humber; and there was no witness to or evidence of any statements made to Robert Lee Humber, except Robert Lee Humber himself, who was a party to this suit, opposed to appellant, and actively seeking to recover in behalf of the Paris Church a large portion of it. In fact, the court by its judgment has granted part of it to Humber as a naked trustee for the Paris Church, without the requirement of any bond, or security of any kind or character.

"The testimony of Humber concerning the various purchases by the Armingtons was: that he 'sold' the interests to the Armingtons; that they paid him for them the sum of $34,500.00 in American money; that they made 'those purchases' over a period of time from the autumn of 1933 through the year 1938; that the $34,500.00 was received by him for Gilcrease Oil Company and 'they got it'; that when the Armingtons purchased the properties, they paid, in one form or another, the full purchase price in each instance; that over a period of time the Armingtons had discussed with Humber 'how they would dispose of their property'; that the Armingtons paid $10,500.00 for 'their interest' in the Free lease; $8,000.00 for the 'interest' in the Christian lease; $6,000.00 for 'their interest' in Texas No. 1 and $10,000.00 for 'their interest' in Texas No. 2; at the time the 'various purchases' were made they told him 'they had not yet decided in whose names they wanted the assignments established. * * * they were deliberating as to whom the assignments ultimately should be made out to; they would take ample time to think it over.' In February of 1939 the Armingtons told Humber they had 'decided to give the American Church at that time $5,000.00;' Humber told them they should write a letter to the church 'offering that gift,' which they did. Humber reported to the church that the Armingtons had 'transferred to the church an investment of $5,-000.' the income from which should continue to go to the Armingtons during their life. Not until July 19, 1939, was Humber aware that the Armingtons had decided to 'increase their gift' from $5,000.00 to

$10,000.00. The Armingtons told Humber they desired 'to increase their gift' to the church. At a church dinner Mr. Armington stated that he had instructed Gilcrease to increase from $5,000.00 to $10,000.00 'their gift' to the American Church in Paris. In regard to the purchases the Armingtons told Humber: 'In regard to the income, they wanted the income; wanted the company to send them a check every month. They also told me that they had not yet decided in whose name they wanted the assignments made out, that in due course of time they would advise me in regard to that detail. They said, 'Just let the company know that they will receive instructions.. When we have decided ourselves what we want to do, we will notify them.' The Armingtons said they didn't want the assignments made out until they would give the names of the people in whose names they wanted them issued. When the Armingtons handed Humber Exhibits 'B' and 'C,' they stated that they had decided 'to increase their gift to the church' from $5,000.00 to $10,000.00. They told Humber they would accept the revenue as it came over, but they did not want the assignments made out until they had decided where they wanted their property to go. They wanted income from the investments, but they didn't want the assignments made. The Armingtons' dealings with the oil properties were carried on entirely through Humber, 'they bought them' through him, and he as agent for Gilcrease Oil Company was holding those properties subject to instructions from the Armingtons; such was true on July 19, 1939. The properties which were 'sold' to the Armingtons were producing oil properties from the beginning, and as long as the Armingtons were in France the income therefrom was paid to them. There was an income from these investments at all times. When the Armingtons 'purchased these properties from Gilcrease Oil Company' they paid the full purchase price therefor and 'nothing remained to be done by Gilcrease Oil Company except to execute good and sufficient assignments of this property' and the only thing that remained was to follow any further instructions that might be given by the Armingtons, which Humber stood pledged to do. Gilcrease Oil Company had nothing left to be done in connection with 'these purchases by Frank M. and Caroline Armington' except to execute assignments according to Frank M. and Caroline Armingtons' instructions.

"Following Caroline Armington's death Humber, who was a graduate lawyer, wrote a letter to the lawyer for her estate in New York, in which he stated:

"'Mr. and Mrs. Armington were formerly owners, as joint tenants with rights of survivorship and not as tenants in common, of undivided interests in numerous oil producing properties operated by the Gilcrease Oil Company in the State of Texas, but in July, 1939, approximately three months prior to their departure from France, they disposed definitely of all their holdings either to relatives or to The American Church of Paris, instructing the Gilcrease Oil Company to establish new titles in the names of their assignees. * * * Personally I do not believe that the estate of Mrs. Armington is subject to any taxes on her former interests with the Gilcrease Oil Company. In July, 1939, when she disposed of her interests in the above properties her decision was not made in view of approaching death but simply with the idea of regulating her business with the Company prior to her departure from France. * * * May I not also remark that, even if she had not disposed of her interest with the Company, her title, in my opinion, would have exempted her estate from taxes, because the title was established in the names of her husband and herself, with rights of survivorship and not as tenants in common.'

"Let us now look at the evidence of the nature of the purchases which came from the books and officers of the company itself.

"The evidence showed that Lester Whipple, attorney for Gilcrease Oil Company, had gone so far as to make out actual assignments to Frank M. and Caroline Armington covering various ones of the interests here involved. These assignments appear to have been executed by the president of the company, but not to have been delivered to anyone. They were all made out to 'Frank M. Armington and Mrs. Frank M. Armington (nee Caroline Wilkinson) as joint tenants with rights of survivorship and not as tenants in common.' Mr. Whipple testified that he did not customarily draw instruments of that kind without some information to act upon, but he did not know where he got the

information which he used in these instances, although he was sure he did get information of some kind. On December 24, 1941, Mr. Whipple wrote to some Florida attorneys to the effect that the Armington estate located in Texas 'consists of certain working interests in oil and gas leases under producing wells in Texas * * *' and inquired as to whether there was any contest between these lawyers' clients and Mr. Armington's second wife. On January 12, 1942, Mr. Whipple wrote to some New York lawyers that the Armingtons' interests in the Gilcrease Oil Company leases 'was community property, being originally purchased with funds belonging to the community between Frank M. Armington and his first wife' and further stated that 'because the subject of the investment is real estate located in Texas which would be governed by Texas law on this subject,' he believed Armington's will could not dispose of more than an undivided one-half interest. He also stated that he had in his files 'written instructions' from Caroline Armington and Frank M. Armington to pay the income from these properties to various persons 'which might be construed as an assignment or a conditional assignment of the interest.' On January 31, 1942, Mr. Whipple again wrote to the Florida attorneys representing the Wilkinsons that: 'It would seem to us possibly that these instruments are a conveyance in anticipation of death and have the effect of severing the income from the real estate and might be construed as an assignment of the income to the persons named therein.'

"E. E. Parsons was employed by the oil company as its auditor and had been for some time, and determined how entries should be made on that company's books. He had access to all of the records of the office, and if he wanted information he looked it up himself.

"In reply to a letter from Frank Armington, on April 12, 1940, Mr. Parsons wrote to Armington, that each one of the investments appeared in the files and records of the Gilcrease Oil Company as undivided working interests in the leases and stood in the name of 'Frank M. and Caroline Armington as joint tenants with rights of survivorship and not as tenants in common.' At the trial Mr. Parsons was unable to testify as to the source of the information he had at the time of that letter, but stated that it must have come from the records of the company.

"On November 8, 1940, more than a year after the alleged 'instructions,' Gilcrease Oil Company, on stationery of the 'accounting department' wrote to the attorneys for the Caroline Armington estate and said:

" '* * * we submit below the estimated value of the undivided interests owned by Frank M. and Caroline Armington in producing oil and gas leases operated by this company. * * * When the estate is settled, kindly furnish us a copy of the decree showing disposition of Mrs. Armington's interests. At present, our records show 'Frank M. and Caroline Armington, as joint tenants with rights of survivorship and not as tenants in common.'

"Throughout cross-examination of the witness Parsons and of the attorney for Gilcrease Oil Company, Mr. Whipple, this Court will find efforts to obtain the source of the information which these gentlemen had and upon which they based their unequivocal assertions that the Armingtons were considered by them as being the owners of the property. Because of their testimony that they must have gotten the information from the records of the company, but that they were now unable to find such records, the court admitted these letters which came from the possession of appellant.

"Original records (such as could be found) of the Gilcrease Oil Company were introduced in evidence by appellant. These records showed simply that on certain dates the Gilcrease Oil Company had sold to the individuals named therein certain interests in the properties referred to. The records indicate that the Gilcrease Oil Company received certain money from certain sales made to certain persons and contained no indications of anything other than an outright purchase by the Armingtons of the interests involved.

"The initial purchase by the Armingtons was in the year 1933, and their purchases continued through 1938, which was the last date. In 1934 the Armingtons had completed their purchases of a $10,500.00 interest in the Free lease.

"The second purchase by the Armingtons was in the J. M. Christian lease, on which the sales were completed in 1935. In the year 1935 the Armingtons had completed

the purchase of their $8,000.00 interest in the Christian lease.

"Defendant's Exhibit 18 shows a $6,000.00 investment by the Armingtons in 1936 in Texas Deal No. 1.

"The last investment on Texas No. 2 was on Dec. 1, 1938. The total investments by the Armingtons in Texas No. 2 were $10,000.00, and these were made in 1937 and 1938."

It is apparent from the pleadings and evidence that the Armingtons at different times purchased and fully paid for the properties herein involved. The Gilcrease Oil Company stood ready at all times to convey these interests to the Armingtons or to any other person or persons who might be named by the Armingtons. Under such circumstances, the equitable title stood in the Armingtons and until the legal title was fully transferred to some one else this title remained in the Armingtons. 20 Tex.Jur. p. 262, § 53. In 38 C.J.S., Gifts, § 16, p. 793, it is stated:

"In order to be effectual a gift must be fully executed, for the reason that, there being no consideration therefor, no action will lie to enforce it. If anything remains to be done, the transaction is a mere executory agreement to give, and the title does not pass. Until the gift is thus made perfect, a locus pœnitentiæ remains, and the owner may make any other disposition of the property that he may think proper. This rule applies whether the gift is by delivery only or by creation of a trust in a third person or in the donor.

"To be effective, a gift must go into immediate and present effect. A mere intention to make a gift, however clearly expressed, which has not been carried into effect amounts to nothing, and confers no rights in the subject matter of the proposed gift on the intended donee. The intention must be executed by a complete and unconditional delivery."

In the same authority, Sec. 42, p. 821, it is stated:

"A gift inter vivos, by its very definition, is perfected and becomes absolute during the lifetime of the donor and the donee. A gift of property to take effect after the donor's death, the donor in the meanwhile retaining control and dominion of the property, cannot be sustained as a gift inter vivos. Thus a gift inter vivos is not effective if delivery to the donee is made conditional on the donor's death; and delivery of the property, where control or power over it vests in the donee only after the death of the donor, does not amount to a gift inter vivos. It is not necessary that the condition that the property shall not pass until the death of the donor be expressly stated, in order to invalidate the gift as one inter vivos; it is sufficient if the condition is implied. On the other hand, if the gift is absolute, the mere postponement of its enjoyment until the death of the donor is not material, and will not defeat it.

"*Effect of statutes governing testamentary disposition.* Gifts to take effect after the donor's death, the donor meanwhile retaining control and dominion of the property, are in contravention of the statutes governing testamentary disposition."

What was here undertaken by the Armingtons was simply a gift inter vivos of real property which was never completed during the lives of the donors.

In 38 C.J.S., Gifts, § 57, p. 843, the rule is stated as follows: "The general rule is that a parol gift of land is invalid and is ineffectual to pass title to the donee; and this is true even where the gift is accompanied by possession, unless such possession is adverse as against the donor and continues without interruption for the statutory period, unless after taking possession the donee makes permanent and valuable improvements, or unless such other facts exist as would make it a fraud on the donee not to enforce the gift."

Apparently, at the time the properties were purchased and paid for by the Armingtons they did not themselves know to whom they would give their property. What they wanted was to enjoy all the revenue from the property during their lives and then have the property go to such persons as they might later decide upon. They first decided to give the Church in Paris $5,000, but later decided upon $10,000, which shows their complete control of the property. The Gilcrease Oil Company did not question their right to make such changes. When the Armingtons gave the list of names to whom the assignments were to be made they also told Humber not to execute such assignments until he returned to San Antonio. Humber did not arrive in San Antonio until after the death of the Armingtons. Undoubtedly the Armingtons had a right to revoke such gifts up until Humber arrived in San Antonio

Frank M. Armington did write a letter to the company, in effect revoking such gifts and directing that the assignments be made in his name so that his second wife, Jessie Fisher Armington, would receive the property upon his death, as the sole beneficiary of his will. The only reason given for not carrying out his instructions was that he told an attorney for the company to disregard such instructions. The company did not question his authority to give such instructions.

■ Appellee American Church in Paris in its brief contends that the equitable title did not pass to the Armingtons because the purchase contract expressly provided that it should not. We do not agree that the contract so provided. The only stipulation of this nature testified to was that the assignments were not to be executed, and there was no stipulation as to when or to whom the equitable title was to pass. The passing of the equitable title is a matter of law and not a matter of stipulation in a contract. Whenever certain facts and conditions are shown to exist the equitable title passes as a matter of equity and is not a proper subject of contract between the parties. The parties may stipulate as to when and to whom the legal title shall pass but not the equitable title. The properties here involved having been sold by the Gilcrease Oil Company to the Armingtons for a certain consideration, when that consideration was fully paid by the Armingtons they acquired an equitable title to the properties and such title was not affected by the fact that the Armingtons told the company to delay the execution of the assignments until they decided to whom they wanted the assignments executed. This is true because in this suit the Gilcrease Oil Company has raised no question as to the Statute of Frauds, Art. 3995, Vernon's Ann.Civ.Stats., but, on the contrary, has admitted in writing that it had sold to the Armingtons the properties herein involved and that the Armingtons had fully paid for said properties.

■ There being no completed gift of these properties to any one at the time of the death of Caroline Armington, her interest therein passed to her husband, and at the time of his death all of the properties passed to the beneficiary of his last will, Jessie Fisher Armington.

■ Appellant contends that interpleader should not be permitted to recover here-in because it was not absolutely impartial and disinterested. We overrule this contention and affirm that part of the judgment which permits a recovery upon the part of interpleader.

In all other respects the judgment of the trial court will be reversed and judgment rendered in appellant's favor for the properties herein sued for by her in her cross-action, subject to the operating contracts of the Gilcrease Oil Company.

The costs of the trial court and of this court shall be taxed against all the appellees except Gilcrease Oil Company.